UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TAMMY S. HENDERSON, | ) | CASE NO. 3:12CV2794 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Tammy S. Henderson ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

## I. PROCEDURAL AND FACTUAL HISTORY

On May 4, 2009, Plaintiff applied for benefits alleging disability beginning on October 23, 2000. ECF Dkt. #13 ("Tr.") at 159-166.[2] Plaintiff's date last insured is September 30, 2014. Tr. at 172. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 100-101. Plaintiff requested an administrative hearing, and on February 24, 2011, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and Dr. Vanessa Harris, an impartial vocational expert ("VE"), who appeared by telephone. Tr. at 43-82.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

On April 20, 2011, the ALJ issued the Decision denying benefits. Tr. at 27-37. Plaintiff filed a request for review, which was denied by the Appeals Council on June 20, 2012. Tr. at 1-5.

On November 7, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On April 2, 2013, with leave of Court, Plaintiff filed a brief on the merits. ECF Dkt. #15. On May 1, 2013, Defendant filed a brief on the merits. ECF Dkt. #16. On June 17, 2013, with leave of Court, Plaintiff filed her reply brief. ECF Dkt. #18.

**II**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was thirty-five years of age on her alleged disability date and forty-five years of age on the date of the hearing, suffered from bilateral foot problems, which qualified as a severe impairment under 20 C.F.R. §404.1520(c). Tr. at 29. The ALJ characterized Plaintiff's lower back pain, abdominal problems, migraine headaches, and anxiety as non-severe impairments. Tr. at 29-31. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 ("Listings"). Tr. at 31.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of sedentary work: Plaintiff is able to lift and carry up to twenty pounds occasionally and ten pounds frequently. Plaintiff can stand or walk for up to four hours, and sit for up to six hours in an eight-hour workday. Plaintiff can occasionally balance and occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds, or operate foot controls. Additionally, Plaintiff must avoid even moderate exposure to unprotected heights and dangerous moving machinery. *Id.* at 32.

The ALJ ultimately concluded that, although Plaintiff could not return to her past relevant work as a retail clerk or cashier, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of table worker, toy stuffer, and ticket counter. Tr. at 36-37. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.    ANALYSIS

Plaintiff advances several arguments in this appeal. First, Plaintiff contends that the ALJ erred when he did not find that Plaintiff's regional complex pain syndrome, or reflex sympathetic dystrophy ("RSD"), was a severe impairment at the second step of the sequential analysis. Next, Plaintiff argues that the ALJ erred in failing to accord controlling weight to the opinion of Plaintiff's treating neurologist/pain management physician, Mahmoud Mohamed, M.D., and further failing to address the regulatory requirements of 20 C.F.R. §404.1527(D)(2), SSR 96-2P, 96-3P, and 96-6P. Third, Plaintiff argues that the ALJ failed to properly consider the dosage, side effects, and efficacy of Plaintiff's pain medication. Finally, Plaintiff contends that the testimony of the VE was inconsistent with the Dictionary of Occupational Titles/Selected Characteristics of Occupations regulations regarding general educational development, specifically, language, and Plaintiff's actual educational background and physical capabilities.

### A.     Medical history

From December 2003 through May 2010[3], Plaintiff treated with Michael Walkovich, DPM Tr. at 268-338, 440-55, 514-84. Dr. Walkovich diagnosed bilateral foot pain, plantar fasciitis, bursitis, calcaneal spurring, tendinitis, right heel pain with neuralgia, tarsal tunnel syndrome, metatarsalgia, chronic pain, radiculopathy, ankle sprain, and contusion. Tr. at 268-338, 440-55, 514-84. Through the years, Plaintiff's treatment included orthotics, injections, the implantation of a spinal cord stimulator, and multiple surgeries, including bilateral plantar fasciectomies and bursectomies in 2004, cryotherapy, and bilateral tarsal tunnel release in 2006. Tr. at 284, 295, 321-22, 329, 401-03, 410-12, 424-26, 463.

Following tarsal tunnel surgery on her left foot, on May 10, 2006, Dr. Walkovich opined that the surgery was a success, because "Plaintiff continue[d] to have complete relief from previous burning pain." Tr. at 275. Nonetheless, the same treatment notes indicate that Plaintiff "noticed some burning pain on the outside/top of her left foot." Tr. at 275. Following tarsal tunnel surgery on her right foot, in November 28, 2006, Dr. Walkovich observed that Plaintiff could return to work with restrictions, that is, four hours per day for four weeks. Tr. at 307. On December 28, 2006, Plaintiff reported pain in her right heel, however Dr. Walkovich noted that the she was having no difficulties from her previous surgery at the right tarsal tunnel.

In September of 2007, Maggi Smith, DPM, conducted an independent medical exam. Tr. at 649-52. Dr. Smith opined that Plaintiff did not have RSD[4] because her tarsal tunnel syndrome

---

[3]Between May 2003 and June 2010, Plaintiff sought medical treatment at Toledo Hospital for a variety of conditions, including epigastric pain, gall stones, cough, muscle strain, and pain. Tr. at 347-74, 699-731. Plaintiff also received general medical treatment and pain management from Philip Lepkowski, M.D., of the Toledo Clinic, from October 2000 through October 2010. Tr. at 375-95, 585-669.

[4]RSD is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSD. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. SSR 03-2p.

improved with surgery. Tr. at 650. Dr. Smith opined that Plaintiff could stand or walk up to four hours at a time, and she could return to work immediately. Tr. at 650.

In October of 2007, Plaintiff consulted with Michael Coulter, P.T., Cert. M.D.T., C.E.E.S. Tr. at 456-90. In a letter dated October 5, 2007, Mr. Coulter advised Dr. Walkovich that Plaintiff could perform work at the light level of exertion, but only part-time if she was required to stand constantly Tr. at 460. He opined that Plaintiff could return to four-hour shifts at Rite Aid, if she could sit two or three times per shift for approximately five to ten minutes. Tr. at 460. Mr. Coulter wrote, "Should [Plaintiff] pursue a different career path, where constant standing was not required (mostly sitting), she would be qualified for full time work at the light physical demand level for an eight-hour day." Tr. at 462.

In 2008, Hungchih Lee, M.D., of IntegraCare Pain Relief Centers, suggested that Plaintiff undergo spinal cord stimulator treatment. Tr. at 470. Dr. Lee expressed his intention to submit Plaintiff to a psychiatric evaluation prior to spinal cord stimulator treatment including a trial and final implementation.

Despite ongoing and aggressive efforts to treat Plaintiff's foot problems, in April of 2009, Dr. Walkovich conceded that all treatment options had been exhausted, and he recommended that Plaintiff seek a second opinion due to his inability to treat her ongoing pain. Tr. at 450. He referred her to Stresscare Behavioral Health, Inc., where she received pain management treatment from April through June 2009. Tr. at 430-35. Plaintiff also received pain management treatment from PainCare of Northwest Ohio. Nathan Hill, M.D., recorded Plaintiff's complaints of pain when standing for more than four hours and observed that her ankle strength was slightly decreased. Tr. at 733, 735. Examination findings were unremarkable, and Dr. Hill recommended that Plaintiff continue her medication and home exercise program, which was both medically appropriate and necessary to reduce her pain and increase her functioning. Tr. at 733, 735-736, 737-38. He also recommended a urine toxicology screening due to Plaintiff's use of pain medication. Tr. at 432.

From July 2009 through February 2011, Plaintiff treated with Dr. Mohamed, a neurologist at Comprehensive Neurology and Headache Center. Tr. at 491-500, 670-698. During her initial evaluation on July 9, 2009, Plaintiff reported that she originally sustained an injury over time while

-6-

working at a department store. Tr. at 496. Plaintiff complained of foot pain, numbness, tingling, and excruciating pain radiating up her right leg.  Plaintiff told Dr. Mohamed that she had tarsal tunnel surgery performed on three separate occasions with no pain relief.  Dr. Mohamed conducted an examination, during which he observed "almost absent vibration sense with decreased pinprick in the toes" and "decreased ankle jerk on the right and absent on the left." Tr. at 496. Dr. Mohamed prescribed medication and ordered an electromyography ("EMG") and a nerve conduction study, which revealed evidence of a left axonal, peroneal mononeuropathy, and previous bilateral tarsal tunnel release surgery.  Tr. at 496, 499.  He identified as "allowed conditions," bilateral RSD, bilateral calcaneal spur, bilateral fibromatosis, and bilateral tarsal tunnel syndrome.  Tr. at 698.

When Plaintiff returned on July 23, 2009, she continued to complain of pain, but her sensory examination remained unchanged. Tr. at 495.   On August 14, 2009, Plaintiff returned to Dr. Mohamed after she twisted her ankle. Tr. at 494.  Plaintiff reported that she was in considerable pain.  Dr. Mohamed noted that Plaintiff "took a lot of Percocet," and he refilled her prescription even though it was "somewhat early." Tr. at  494. He advised Plaintiff to ice and wrap her ankle and to follow up with him within a month.  Plaintiff returned ten days later, she continued to complain of pain and presented with a cane.  Tr. at 493. Dr. Mohamed refilled her medication. Tr. at 493.

In September of 2009 Plaintiff complained of "severe excruciating leg pain" and difficulty sleeping. Tr. at  492.  Her gait was stiff and slow, and Dr. Mohamed observed that her ankles were swollen and tender, and her feet were cold. Tr. at 492. Plaintiff stated that her pain increases with changes in the weather.  Dr. Mohamed increased her pain medication. Tr. at 492.  On October 22, 2009, Plaintiff returned to Dr. Mohamed for a follow-up examination and medication refills.  Tr. at 690. Her gait was stiff, but she did not use a cane.  She was working at the time but reported ongoing pain and mild generalized weakness.  Tr. at 690. Dr. Mohamed's examination revealed tenderness and cold feet.  Tr. at 690.

On November 19, 2009, Plaintiff complained of bilateral ankle pain and stiffness that worsened in the cold, damp weather. Tr. at 689.  Dr. Mohamed observed that Plaintiff's feet were cold and tender, but she was ambulating without a cane. Plaintiff indicated that she was "managing with the current medications." Tr. at 689.  On December 17, 2009, Plaintiff reported that she was

-7-

working part-time, and that, although she experiences a lot of pain, her medication "help[s]." Tr. at 688.

On January 14, 2010, Plaintiff returned to Dr. Mohamed for a follow-up examination and medication refill. Tr. at 687. She reported aches and pains, but admitted that her pain was "fairly controlled by her medication." Tr. at 687. On February 2, 2010, Plaintiff complained of swelling in her left leg, however an X-ray revealed no abnormalities. Tr. at 686. On February 12, 2010, Plaintiff continued to complain of pain, but her examination results were unremarkable, and Dr. Mohamed refilled Plaintiff's medication. Tr. at 684. He counseled her against taking a double dose of Ambien Tr. at 684.

On March 9, 2010, Plaintiff reported that "overall she [was] doing well", and admitted that she was planning a trip to Mississippi. Tr. at 683. Her gait was slow but steady. On April 6, 2010, Plaintiff reported that she had difficulty working full days because her feet were "killing" her, and she advised Dr. Mohamed that she wanted to limit her work schedule to four hours a day for five weeks. Tr. at 682. Other than mild tenderness in Plaintiff's lumbosacral area, Dr. Mohamed's examination findings were unremarkable. Tr. at 682. Nevertheless, Dr. Mohamed drafted a note in which he restricted Plaintiff's work hours. Tr. at 682.

On May 4, 2010, Plaintiff reported that "so far things are so good for her." Tr. at 681. She admitted that her foot had improved, Percocet had "helped her a lot," and she stated that she had no complaints. Tr. at 681. She reported that her symptoms improve with warmer weather. On June 4, 2010, Plaintiff continued to report feeling well and cited sleep as her biggest problem. Tr. at 680. On June 22, 2010, Plaintiff reported swelling in her legs and feet, and stated that she was unable to stand for any length of time and wished to be off work. Tr. at 679. Plaintiff underwent a Doppler study, which was negative for deep vein thrombosis. Tr. at 679. In July of 2010, Plaintiff continued to complain of swelling and difficulty walking, lifting, sitting, or standing for any length of time. Tr. at 678. Dr. Mohamed recommended another month away from work to speed her recovery. Plaintiff's swelling improved in August of 2010, but she continued to complain of a pins-and-needles sensation in her feet. Tr. at. 677.

In September of 2010, Plaintiff advised Dr. Mohamed that she was unable to work and she needed additional time away from work. Tr. at 676. Plaintiff's gait was steady. In October of 2010, Plaintiff complained of low back pain and numbness in her right leg after she received an iron injection in her right buttock. Tr. at 675. Dr. Mohamed observed that her gait was stiff but steady, and he refilled her medication. In November of 2010, Plaintiff continued to complain of pain in her feet as well as her back, which Dr. Mohamed noted was a new problem that related to a previous worker's compensation claim. Tr. at 674. In December 2010, Plaintiff reported that Percocet "takes the edge off" her pain. Tr. at 673.

On January 24, 2011, Plaintiff continued to complain of pain, but admitted that her medications were helpful. Tr. at 672. Dr. Mohamed observed that her gait was stiff. On February 11, 2011, Dr. Mohamed noted that Plaintiff had problems with her feet and her heel, and opined that she had RSD. Tr. at 671. He attempted to have low back pain and lumbar neuritis added to Plaintiff's worker's compensation claim. Tr. at 672. Upon examination, Dr. Mohamed observed that Plaintiff's feet were tender, and a straight leg-raising test produced positive results on her right side. Tr. at 673. He gave Plaintiff an injection of Nubain. Tr. at 672.

### B.    State agency mental assessments

In September of 2007, W. Jerry McCloud, M.D., completed a physical RFC assessment in which he opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand and/or walk for six hours in an eight-hour day. Tr. at 340. He further opined that Plaintiff could never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl. Tr. at 341. Dr. McCloud opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations. Tr. at 342-43. His assessment was predicated upon a diagnosis of bilateral tibial neuralgia.

On June 30, 2009, Diane Manos, M.D., conducted a file review. She acknowledged that Plaintiff claimed that she could not be on her feet for more than four hours. Dr. Manos observed that in her meeting with Plaintiff, she showed no difficulty standing, walking, or sitting. Dr. Manos found no medical evidence of record to support the diagnosis of RSD. Although Dr. Manos believed

that Plaintiff did have some limitation due to her foot problems, Dr. Manos opined her foot problems did not result in a severe functional impairment. Tr. at 438.

In December of 2009, William Bolz, M.D., completed a physical RFC assessment in which he opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight-hour day, and sit for six hours in an eight-hour day. Tr. at 507. He further opined that Plaintiff could never climb ladders, ropes, or scaffolds, and could occasionally balance and climb ramps and stairs. Tr. at 508. Dr. Bolz opined that Plaintiff had no manipulative, visual, or communicative limitations, but she must avoid even moderate exposure to hazards such as machinery or heights. Tr. at 509-10.

### C. Hearing testimony

Plaintiff testified that she lives with her husband and her twenty-one year-old son. Tr. at 50. Plaintiff stopped working in June of 2010. Tr .at 51. Previously, she worked a twelve-hour work week, four hours per day, as a cashier at Big Lots. Tr. at 52-53. She worked at Big Lots for approximately seven months, and was assigned to the cash register when she could not lift stock due to back and foot pain. She further testified that she could work two hours with a break. Tr. at 53. Prior to Big Lots, Plaintiff worked for seven years at Rite Aid. She worked the cash register at Rite Aid since she could not stock. Plaintiff worked a twenty-hour work week, four hours per day. Tr. at 54. Plaintiff testified that she experiences burning pain and numbness in her feet. At the time of the hearing, she was prescribed Percocet, Ambien, Neurontin, and Xanax. Tr. at 57. According to her testimony, Plaintiff experienced temporary relief from injections, but nothing, other than laying down, alleviates her pain. Tr. at 60. Plaintiff explained that her back pain began approximately two months before the hearing. Tr. at 59. Plaintiff further explained that she suffered panic attacks, approximately one per week, however, she never sought treatment. Tr. at 58. Exposure to florescent lighting triggers Plaintiff's migraines, which she treats with Excedrin. Tr. at 62. Plaintiff has a hiatal hernia that she treats with Zantac. Tr. at 64. Plaintiff experiences pain in her shoulders when she reaches and has difficulty crouching and bending. Tr. at 72-73.

Plaintiff testified that her son cooks, cleans, and helps around the house. Tr. at 61. She further testified that she cannot make a bed, nor sleep in one. Plaintiff spends most days laying on

the couch watching television. Tr. at 68. She is able to drive a few miles approximately three times per week. Plaintiff cannot walk around the block and she has difficulty using stairs. Tr. at 70-71. She smoke a half a pack of cigarettes every day and collects workers' compensation benefits in the amount of $214.44 every two weeks. Tr. at 70, 67.

### D.     The ALJ's decision

Despite Plaintiff's long history of foot pain, the ALJ questioned her credibility based upon inconsistencies in the record. First, he noted that Plaintiff testified at the hearing that she could lift no more than a gallon of milk, but also testified that she lifted thirty pounds when she was employed at Rite Aid. Tr. at 34. Furthermore, Plaintiff testified that her son and husband perform all of the house work, but in a function report[5] dated May 15, 2009, Plaintiff wrote that her daily activities included house cleaning and laundry.[6] The ALJ also asserted that Plaintiff appeared to be exaggerating her limitations during the hearing. The ALJ predicated his conclusion on the fact that Plaintiff claimed that she had difficulty reaching overhead and opening jars (which she attributed to having small hands), and that she could not walk one block, all of which are inconsistent with her testimony that she shops for groceries. The ALJ further concluded that Plaintiff's alleged limitations are inconsistent with the limitations reported in detailed functional examinations. Tr. at 35.

The ALJ ultimately concluded that Plaintiff could stand or walk for at least two hours per day, based upon the opinions of Dr. Walkovich, Dr. Mohamed, Dr. Smith, and the state agency physicians. Tr. at 35. He further cited an undated function report, in which Plaintiff wrote that she

---

[5]In a function report completed in May 2009, Plaintiff reported she was able to care for her personal needs; prepare meals; launder clothes; perform household chores; drive; go out alone; socialize with others in person and on the phone; and shop in stores. Tr. at 199-202. Plaintiff further reported that she was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. Tr. at 202. Her hobbies included reading, watching television, and sitting on a swing outside. Tr. at 202. She reported that she was able to pay attention, and she could finish tasks that she started. Tr. at 203. She had no difficulty following written or spoken instructions, got along "great" with authority figures, and handled stress "great." Tr. at 203-04. She stated that she "loved people." Tr. at 203.

[6]Plaintiff argues that her pain increased over time, and, therefore, she criticizes the ALJ's reliance on statements she made prior to 2010. However, Plaintiff claims that she has been disabled since 2000, and, as a consequence, the ALJ's reliance on statements early in the record are relevant to his disability determination.

-11-

"can[not] be on [her] feet any longer than 4 hours." Tr. at 190. She continued, "Have to get off my feet and relax a lot. A lot of pain and discomfort." Tr. at 190.

The ALJ credited the opinion of Mr. Coulter, that Plaintiff could perform full time work involving constant standing for four hours at a time, while at the same time, acknowledging that Mr. Coulter is not an accepted medical source within the meaning of the regulations. The ALJ cited SSR 06-3p for the proposition that Mr. Coulter specializes in "performing functional evaluations and performed a very detailed examination of [Plaintiff.]" Tr. at 35. The ALJ further asserted that Mr. Coulter's opinion was consistent with the medical opinions in the record. Tr. at 35. He cited Dr. Smith's conclusion that Plaintiff does not have RSD because she improved with surgical intervention. Dr. Hill, a pain management specialist, acknowledged that Plaintiff had worsening pain when she must stand on her feet for more than four hours. Likewise, Dr. Mohamed, a neurologist and pain management specialist, restricted Plaintiff to standing four hours per day. Similarly, the state agency physicians concluded that Plaintiff was capable of standing and/or walking for at least two hours per day, and sitting for approximately six hours per day in an eight-hour workday.

### E. Plaintiff's arguments

Turning to Plaintiff's first argument, at step two, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a). The Regulations define basic work activities as being the " 'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug.27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will

-12-

generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle*"* in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 416.920(d).

Here, the ALJ described Plaintiff's severe impairment at step two as bilateral foot problems. Tr. at 29. Later in the decision, the ALJ defines "bilateral foot problems," as including "[RSD], tarsal tunnel, arthritis, and nerve damage." Tr. at 32. As a consequence, the ALJ did characterize Plaintiff's RSD as a severe impairment. Furthermore, even assuming arguendo that the ALJ concluded that Plaintiff's RSD is not a severe impairment, that determination does not constitute error at step two.

In her second argument, Plaintiff contends that the ALJ erred when he did not give controlling weight to the opinion of treating physician, Dr. Mohamed. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers*, 486 F.3d at 243. If that presumption is not rebutted, the ALJ must

-13-

afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6). However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Plaintiff contends that the ALJ erred in rejecting Dr. Mohamed's conclusion that she suffers from RSD. The diagnosis and treatment of RSD is addressed in SSR 03-2p, which reads, in pertinent part:

> RSDS/CRPS patients typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch. The degree of reported pain is often out of proportion to the severity of the precipitating injury.
>
> . . . .
>
> Clinical studies have demonstrated that when treatment is delayed, the signs and symptoms may progress and spread, resulting in long-term and even permanent physical and psychological problems. Some investigators have found that the signs and symptoms of RSDS/CRPS persist longer than 6 months in 50 percent of cases, and may last for years in cases where treatment is not successful.
>
> . . . .
>
> RSDS/CRPS constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings. . . . RSDS/CRPS may be the basis for a finding of "disability." Disability may not be established on the basis of an individual's statement of symptoms alone.
>
> For purposes of Social Security disability evaluation, RSDS/CRPS can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the

>following clinically documented signs in the affected region at any time following the documented precipitant:
>
>• Swelling;
>
>• Autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
>
>• Abnormal hair or nail growth (growth can be either too slow or too fast);
>
>• Osteoporosis; or
>
>• Involuntary movements of the affected region of the initial injury.
>
>When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment. It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present.
>
>. . . .
>
>It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved. Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources.

SSR 03-2p, *3-5 (2003).

First, Plaintiff argues that the ALJ discredited Dr. Mohamed's opinion because he errantly concluded that Plaintiff had only treated with Dr. Mohamed for two months prior to the hearing. To the contrary, a closer reading of the Decision reveals that the ALJ refers to Plaintiff's complaints of back pain, which started two months prior to the hearing, not Dr. Mohamed's treatment. Tr. at 30.

Next, Plaintiff contends that Dr. Mohamed's diagnosis of RSD is well-supported by clinical examination and testing, and, therefore, should be accorded controlling weight. While it is true that Dr. Mohamed diagnosed RSD, there is no analysis and little testing in Dr. Mohamed's treatment notes. See e.g. *Shepard v. Colvin*, 2013 WL 6062006 (E.D. Mich.)(bone scan and EMG nerve study revealed moderate to severe RSD). The EMG conducted on August 5, 2009 revealed a left axonal,

-15-

peroneal mononeuropathy. Tr. at 499. However, Dr. Mohamed provided no analysis of the degree of Plaintiff's RSD. Similarly, other than swelling, the treatment notes do not include any of the additional symptoms listed in SSR 03-2p.

Plaintiff contends that the ALJ had a duty to contact Dr. Mohamed in order to ascertain his explanation for the RSD diagnosis. SSR 96-5p provides as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96–5p, 1996 WL 374183, at *6 (July 2, 1996). In other words, ALJs are required to recontact treating physicians who provide opinions on the issue of disability when two criteria are met: (1) "the evidence does not support a treating source's opinion," and (2) "the adjudicator cannot ascertain the basis of the opinion from the record." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir.2010) (quoting SSR 96–5p, 1996 WL 374183, at *6).

Here, the diagnosis of RSD by Dr. Mohamed is not afforded controlling weight. Rather, Plaintiff's ability to function is the key inquiry. Simply because Plaintiff suffers from a certain condition or carries a certain diagnoses does not equate to disability or a particular RFC. Instead, the residual functional capacity circumscribes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from-though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.2002). "The regulations recognize that individuals who have the same severe impairment may have different [residual functional capacities] depending on their other impairments, pain, and other symptoms." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed.Appx. 425, 429 (6th Cir.2007); 20 C.F.R. §404.1545(e). Despite Plaintiff's diagnosis of RSD, Dr. Mohamed opined that Plaintiff was capable of standing for four hours per day. It is a treating physician's opinion regarding the nature and severity of a claimant's conditions that is afforded controlling weight, see *Wilson,* 378 F.3d at 544, not his diagnoses.

Next, Plaintiff contends that the ALJ failed to consider and address the dosage, side effects, and efficacy of Plaintiff's pain medication in violation of 20 C.F.R. §404.1529(c) and SSR 96-8P.

-16-

Section 404.1529, captioned ""How we evaluate your pain," requires an ALJ to consider "[t]he type, dosage, effectiveness, and side effects of any medication. . .taken to alleviate. . .pain or other symptoms." 20 C.F.R. § 404.1529(c)(iv). Plaintiff attached drug information from www.drugs.com to her brief in this case, which describe the common side effects of each of the drugs she is prescribed. While it is true that Plaintiff takes a number of prescription medications in order to control her pain and to help her sleep, she testified at the hearing that she suffers no side effects. Accordingly, the undersigned recommends that the Court find that Plaintiff's third argument had no merit.

Finally, Plaintiff contends that the representative occupations identified by the VE are not consistent with her education and physical capabilities. It is well established that "[i]n order for a vocational expert's testimony in response to a hypothetical to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir.2010). Here, the ALJ asked the ALJ to identify representative occupations at the sedentary unskilled level.

According to Plaintiff's briefs, the VE who testified at her hearing also testified at the previous hearing of a claimant also represented by Plaintiff's counsel. When asked whether the representative occupations incorporated "various jobs that would vary in terms of exertion and skill level," the VE responded, "It would." Tr. at 79. Plaintiff's counsel then asked, "So that they wouldn't all fit necessarily unskilled one and – at [specific vocational preparation level ("SVP")] one and two and they wouldn't all necessarily be sedentary." The VE responded "Excuse me, these are unskilled SVP one and two jobs, which is what the Administrative Judge asked for. . . .And, counsel, let me just say this on this occasion, I believe I answered these questions less than one hour ago and I'm not going to take this route again." Tr. at 80.

The ALJ summarized counsel's inquiry as follows, "Counsel, let's just – I think what you're asking is whether or not the representative number of jobs includes positions that might have an SVP of above two." Tr. at 80. Plaintiff's counsel agreed that the ALJ had properly restated his question, and the VE responded, "And the answer to that is, no, your honor." Tr. at 80. Then Plaintiff's

counsel asked, "[I]n terms of raw numbers you're giving, do they involve jobs that would be in exertional levels that exceed sedentary or light?" The VE responded, "There are some, yes, but these, the jobs that are represented in the sedentary –." Tr. at 80. Plaintiff's counsel said, "I get that." Tr. at 80. The ALJ summarized the VE's testimony as follows, "I think we've established the record that there could be some jobs and the total number of jobs that the representative – that these representative jobs, that there could be some inclusion of the bigger picture and, so I think that you have made your record on that and . . .if you want to bring it up on appeal." Tr. at 81. Plaintiff's counsel responded, "[B]eing that that number doesn't necessarily represent those that fit this particular job that she cited." Tr. at 81.

In her brief, Plaintiff challenges the ticket taker position, arguing that the position requires a language level of three. DOT Code 219.587-010, captioned "parimutuel ticket checker (amuse. & rec.) alternate titles: ticket counter," reads, in pertinent part: "S GED: R3 M3 L3." Even assuming that Plaintiff is incapable of performing the ticket counter position, the VE also identified the representative occupations of table worker (DOT# 739.687-182, nationally 467,000 positions; 24,500 Ohio; 4,200 Toledo/Lima) and toy stuffer (DOT #731.685-014, nationally 357,000; 18,000 Ohio; 1,000 Toledo/Lima).

In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988),the Sixth Circuit found that 1,350 positions constituted a significant numbers of jobs in local and national economy. See also *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248, at *4 (6th Cir. June 6, 1990), cited in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)(125 jobs in local geographic area and 400,000 jobs nationwide constituted "significant number of jobs" within the meaning of 42 U.S.C. § 423(d)(2)(A)). More recently, in *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574 (6th Cir. 2009), the Sixth Circuit found that "the ALJ's count of 2,000 jobs [for one position] available in the third category withstands Nejat's challenge." Id. at 579. Based on existing case law, the number of jobs available according to the VE's testimony constitutes a "significant number of jobs." See, e.g. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) ("870 jobs can constitute a significant number in the geographic region."). Accordingly, Plaintiff's final argument is not well taken.

## **VI.   CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint with prejudice.

DATE: December 30, 2013

                                        */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).